## THEODORE PLESS v. STATE.

No. A-9314.  Jan. 21, 1938.

(75 P. 2d 910.)

J. Q. A. Harrod and Laynie Harrod, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for the State.

DAVENPORT, P. J. The plaintiff in error, for convenience referred to as the defendant, was by information charged with the crime of murder; was tried, convicted of murder, and sentenced to life imprisonment; from which judgment and sentence he appeals.

An examination of the record, which contains 397 pages, clearly shows it is not necessary to set out in full the testimony, but the substance of the testimony on behalf of the state as given by Iona Harkey, mother of the deceased, Dyris Pless, Evans Harkey, a brother of the deceased, and his wife Palmetto Harkey, and Emma Mae Harkey, sister of the deceased, which testimony is substantially the same; that on December 24, 1936, they were at the home of Iona Harkey, 1338 West Grand, Oklahoma City, Okla., that the house where Iona Harkey lived was a frame house and faced north, with a porch in front with steps leading up from the ground; there was a hallway in the building running north and south, and Iona Harkey lived on the west side of the house and occupied four rooms; the room back of the front room which was on the north was a bedroom and had a door leading

from it into the hallway, and a door from the hall opened out on the porch.

About 10 o'clock on said evening, Dyris Pless, the deceased, came to her mother's house and they were all in the bedroom discussing Christmas presents and exchanging one with another. Shortly after Dyris arrived at her mother's home, the witnesses state they heard the defendant walk up on the porch, knock on the front door, and call for his wife Dyris; that Dyris immediately went to the front door and out on the porch, and immediately thereafter they heard three gun shots distinctly; they all went to the front porch and saw the body of Dyris Pless lying on the ground by the steps of the porch, and saw the defendant running in a northeastern direction across the schoolyard and around the schoolhouse across the street. One of the witnesses picked Dyris Pless up and laid her on the porch, at which time her tam fell off, and when the officers arrived the tam was still on the ground. The police and an ambulance were called, and the ambulance took Dyris Pless to the Oklahoma City General Hospital, where aid was administered. Several police officers testified they were called to the scene; some of them arrived about the time the woman was being placed in the ambulance to be taken to the hospital; that an empty shell was found on the porch and one on the ground, the shells were for a 32-caliber automatic, and fitted the pistol taken off the defendant when he was arrested.

The officers testified they went to the hospital and talked to Dyris Pless, and she told them she was dying, and that her husband, Theodore Pless, was the person who shot her. The officers found the defendant about 12:30 or 1 o'clock the night of the shooting, and after the defendant was arrested and taken to the police station he made a statement that was signed by the defend-

ant, which statement omitting the caption, and signature of the witnesses, is as follows:

"I, Theodore Pless, age 26, of 20 N. Brauer, make this statement of my own free will and accord, without being under threat or promise of any party or parties and after having been advised that what I say herein may be used as evidence in the event criminal charges are filed.

"About 10 p. m. on the night of December the 24, I was at my house with my wife and Joe Edgeworth, a friend of mine came by and asked me to walk down to his brother's house and back with him, which I did, telling my wife, Dyris Pless, that I would be back in about 15 minutes. In about 15 minutes I returned to find my wife gone. She left the fire and lights on so I figured she would be at her mother's house, which is at 1338 W. Grand Ave., so I went over there to bring her home. When I walked up and knocked on the front door, they turned all the lights off in the house and would not come to the door as her mother does not like for me to come around her place. I waited a few minutes on the porch and then went back home. I stayed at my home for about a half an hour and then went back to my mother-in-law's house to get my wife. I knocked on the door this time off and on for about five minutes and no one would answer, although the kitchen light was on. I then said, 'I know my wife is in there, and why don't you come on out and let's go home,' and no one answered. Just as I started to turn and walk off the porch, I heard some one walking through the hall to the front porch where I was and as she opened the door I saw it was my wife. I then told her that she had heard me knocking the first time and she did not say anything. I then said 'Well, come on let's go home, you good and well know your mother and them don't like for me to come here.' She then said, 'Well, I wasn't doing anything.' I then told her I was ready to go home and told her if she was not going I was going on. As I turned to walk off of the porch she grabbed me around the waist and went to tussling with me and we both fell to the porch and as we were scuffling

and falling I pulled a 32 caliber automatic out of my pocket that I had gotten when I went home the last time and put in my pocket before I returned to get her. While we were scuffling on the porch I heard her folks running to the door, then is when I shot her with this automatic, two times is all I remember shooting her. When I shot her she turned me loose and I turned and ran, leaving her on the ground close to the edge of the porch.

"After leaving I went to my sister's house on S. Ellison where she told me the officers were looking for me. I then went down the alley to go to my brother's house on S. Klein, No. 111, and as I started to walk up to the house from the rear one of the officers called me by name and I answered him, told him I had come to give myself up, whereupon he came and took the gun out of my pocket after he made me put up my hands and had asked me where the gun was and I told him in my pocket. They then brought me to the police station.

"When I got off work about 1 p. m., the day this happened, I went by a friend's house on the way home and had one drink of whisky before I went home. I did not have any more to drink before or after this happened.

"Signed (sgd) Theodore Pless."

Iona Harkey, mother of the deceased, was at the hospital and testified with reference to a dying statement made by the deceased. When asked why the defendant shot her, the deceased stated he did not have any cause to do it; she said, "He just asked me why I did not come when I was called; I said, 'I did not hear you'; he just pulled his gun and went to shooting."

To the same effect was the testimony of Palmetto Harkey as to the statement made by the deceased at the hospital in talking with Iona Harkey. The record further shows that testimony was given by Paul Jeter with reference to the dying statement.

P. L. Borden, testifying for the state, stated he was one of the officers who went to 1338 West Grand avenue, on the night of the shooting, and stated the deceased was shot twice in the abdomen, and described the location of the wounds. The empty shells found at the scene of the accident were introduced in evidence.

Dr. Frank Harbison testified the patient was brought to his hospital after midnight:

"I operated on her and the patient expired the 27th, I don't recall the hour, I think in the morning, the chart gives the hour and date. The principal cause of her death was the wound in her breast, uncontrolled hemorrhage and rapid developed pneumonia; she died of the gunshot wound in her chest but the other gunshot wounds were predisposing factors. The patient I am talking about is Dyris Pless."

The defendant, testifying in his own behalf, stated:

"I am the defendant in this case. On the date of the shooting I lived at 20 North Brauer; my wife's name was Dyris Pless; we had been married since August 4, 1935. In 1936 we moved to Tulsa and lived there for a while; during the time we lived in Tulsa my wife shot me in the leg. Dr. Neal treated me; I was treated at the police station but later I was taken to the St. Johns Hospital. I have no children; my wife had two children, Wilbur D. Irvin and Adella Laverne Williams. The father of the boy is Nathaniel Irvin. Prior to December 24, 1936, my wife and I had not had any trouble whatsoever. My wife threatened to kill me about three weeks before the 24th of December, 1936, I kind of feared her, in a way I did; we had not had a bit of trouble on December 24, 1936; I got off from work at noon; I know Joe and Les Edgeworth; Les lives south of me.

"Exhibit No. One is a pistol I bought at the O. L. Pawn Shop for my wife; she wanted a pistol and gave me the money to buy the pistol; I bought it about two

months ago. I have shot the pistol; I think it holds about nine shells. It was a 32 Liberty model. It will fire once or twice and then it will jam. The night of the difficulty Les Edgeworth borrowed the pistol and taken it home with him about 8 or 8:30 o'clock in the evening; later I went down to Les Edgeworth's house and got the gun; I wrapped it up in a pocket handkerchief and stuck it down in my pants pocket and went over to my mother-in-law's house; she lives at 1338 West Grand; her name is Iona Harkey.

"As I walked up on the porch, in this north room the door is facing the east, a light was in the front room and the window curtain was up at the door; I saw this boy, Nathaniel Irvin, and my wife in the front room; when I knocked on the door the light was put out; they did not let me in; I then went back home and turned the gas out in the room where we sleep and lit the oven in the kitchen stove and was going to cook our Christmas stuff that night. My wife was supposed to go to the Christmas tree; when I passed the church it was dark, there were no lights in the church; when I got back to my mother-in-law's house the second time it was about 10 or 10:30; I walked up on the porch and knocked two or three times, directly I looked through this door that was facing north and saw a flash of light in the door when it was opened, and saw my wife walk out in the hall, another man came out with her; then I looked through the window and knocked again, I said I knew my wife was there, 'Why don't you let her out and let her go home?' Directly she walked to the door. The man I saw with her was Nathaniel Irvin.

"When my wife came to the door and asked what did I want, I said, 'Come on, let's go home,' she said, 'Wait a minute,' and I said, 'If you are not going home I am going ahead, you don't have to come now if you don't want to.' When I turned she cracked the door a little wider and pushed the screen back. As I turned to walk off the porch she fastened me around the waist and we went into a scuffle; the gun was in my pants pocket when

she put her arms around me; when she hit that pocket she grabbed the gun. I have a sprained hand, I fastened my hand but didn't have any grip; I turned and got the gun completely out; after she got the gun we scuffled off the porch, and she was around my waist and had the gun; when I fell off the porch she landed on top of me in front of the steps. We scuffled around three or four minutes, maybe five, I did not attempt to shoot her, nor did I go to the house with the intention of killing her. I don't remember how many shots were fired, but I think there was two; she was standing and I was on my knees; after the shots I snatched the gun loose from her.

"The folks in the house came running to the door; I did not know she was shot, I was so scared I did not know what was going on; they was all coming out of the house. I was arrested in the rear of 111 South Klein. I did not have that conversation with officer Barnett as testified to by him in this case."

Some other testimony was introduced by the defendant with reference to the shooting, and also with reference to searching the room of the deceased the next morning and finding a letter in the glove of the deceased.

Les Edgeworth testified to borrowing the pistol the night of the trouble, but defendant came to his home about 10 p. m. the night of the trouble and got the pistol.

The foregoing is the substance of all of the testimony of the state and the defendant deemed necessary to be set out in this opinion.

Several errors have been assigned by the defendant as grounds for reversal of his case. The only assignment argued by the defendant is assignment 9:

"The verdict and judgment is excessive and was incited by passion and prejudice of the jury which was induced by the prejudicial remarks of the county attorney and prejudicial evidence admitted by the court."

Counsel for the defendant in their brief, after setting forth the testimony and facts as shown by the record, urge only that life imprisonment is excessive punishment, and argue at length that the judgment and sentence should be modified to 20 or 25 years.

Under the provisions of section 3204, O. S. 1931, of the Code of Criminal Procedure, 22 Okla. St. Ann. § 1066, this court in furtherance of justice has the power to modify any judgment appealed from by reducing the sentence. Williams v. State, 10 Okla. Cr. 336, 136 Pac. 599; Noel v. State, 17 Okla. Cr. 308, 188 Pac. 688.

The court only exercises that authority under the statute to modify the judgment when it is clearly shown that the ends of justice would be properly met by the imposing of a modified sentence on the defendant. The defendant in this case, in the judgment of the court, has not presented facts tending to mitigate his crime.

The record discloses that the deceased and the defendant were man and wife; that they had been living near the mother of the deceased; that in the evening of December 24, 1936, the deceased advised the defendant she was going to a Christmas program; that the defendant was away from home for some time and when he came back the deceased was not at home. During the early part of the evening the defendant had loaned to his neighbor a pistol he claims to have bought some time previous from a pawnship. After the defendant returned to his home and found the deceased gone, the defendant claims he went by the church where the Christmas program was to be held and found it was dark, and he then went to the home of his mother-in-law and knocked on the door and received no response.

Some time during the evening, the exact time is not

clearly stated, he went to Les Edgeworth's home and got the pistol he loaned to him and put it in his pocket. The defendant claims he went back to his home after his first trip to his mother-in-law's place, and turned the gas out in the sleeping room and turned the gas on in the kitchen oven and was going to prepare their Christmas meal; he then went back to his mother-in-law's home and knocked on the door, and saw his wife and a colored man by the name of Nathaniel Irvin come out of the room; his wife came to the door and he asked her to go home with him, and she said, wait or something of the kind, and he told her if she was not ready she need not go, that he was going and turned to go off the porch and his wife grabbed him around the waist and in the scuffle they both fell off the porch; that his wife in the scuffle got hold of the pistol he had in his pocket and was on top of him, and about that time the family came rushing out from the inside and he shot twice as he remembered it. This evidence of the defendant was contained in a statement made to the officers.

In his testimony on the trial he stated in the scuffle his wife got hold of the gun and it was fired twice and she fell, and he snatched the pistol away from her and ran off, and was arrested later and incarcerated in jail.

The deceased just prior to her death, and while in the hospital, in talking to her mother and other friends, stated she did not know why her husband shot her, as he had no cause to do so. The defendant in his testimony states he and his wife had not had any trouble the day previous to the killing, and tries to make it appear that in the scuffle the shots were fired unintentionally, and says he had no desire to kill his wife and did not intend to kill her.

The acts of the defendant show a malicious and premeditated design on his part, for the reason that he had loaned Les Edgeworth his pistol, and when he went to his home and found his wife gone he went and got the pistol and placed it in his pocket, and then went to the home of his mother-in-law, and after some conversation with his wife on the porch, shot and killed her. There is not a single mitigating circumstance that tends in any way whatever to justify the actions of the defendant.

No authorities have been cited by either the defendant's counsel or the state's, and the only argument presented is the appeal of defendant's counsel for a modified judgment.

He is represented by able counsel, and the record shows that his case was properly tried. There is no complaint of any errors in the trial of the case sufficient to warrant a reversal. It is the opinion of the court that the facts are sufficient to have warranted the jury in returning a verdict sentencing the defendant to the electric chair. This court does not feel that there are any facts in the record to warrant it in modifying the judgment.

The judgment is affirmed.

DOYLE and BAREFOOT, JJ., concur.